GEORGE McKENZIE v. G. N. HOPKINS, H. N. Tucker Company, a Corporation, John R. Jones, Farmers & Merchants State Bank of Kensal, a Corporation, Kensal Implement Company, a Corporation, and Langworthy Lumber Company, a Corporation.

(150 N. W. 881.)

**Land lease — employee — verbal oral contract — crops — indebtedness — new contract — chattel mortgages.**

    1. Defendant Hopkins had a lease of land belonging to the appellant for the year 1908 and prior years. He farmed the land during the years 1909, 1910, and 1911. It is contended by appellant that Hopkins furnished the teams and machinery and did the work as his employee during the year 1911, under a verbal contract to that effect, and providing that appellant should take all the crop, and credit Hopkins with the proceeds of one half thereof on indebtedness due him from Hopkins. Hopkins gave mortgages to the other defendants on a half interest in the 1911 crop. *Held,* from an examination of the evidence, that no new contract was made; that Hopkins was the tenant of appellant for the years 1909, 1910, and 1911, and that the chattel mortgages referred to attached to one half the crop.

**Deposit — order of court — application for — crops — proceeds of — depositary — statute — method of procedure.**

    2, Section 6995, Rev. Codes 1905, being § 7594, Comp. Laws 1913, makes pro-

vision for application to the court for an order directing the deposit of money or delivery of property or effects, and for an order designating a depositary with whom such property, money, or effects may be deposited by the applicant having it in possession, during the pendency of litigation between different claimants for the same, to be disbursed or delivered in accordance with the result of the litigation. In the case at bar the appellant sold Hopkins's share of crops, on which were various chattel mortgages running to respondents. Before paying for the same the purchaser gave notice and made application for the court to designate a depositary, which the court did, and such proceeds were paid to and retained by such depositary. Appellant brought this action to determine the ownership of the fund so deposited. *Held*, that the statute referred to is applicable to this controversy, and furnishes a method of relieving an innocent party from litigating the ownership of the fund as between different claimants, and that the trial court did not err in adjudging the defendants entitled to the amounts covered by their respective chattel mortgages.

Opinion filed January 4, 1915.

Appeal from District Court, Fifth Judicial District, of Stutsman County; *Hon. James A. Coffey, J.*

Affirmed.

*Thorp & Chase,* for appellant.

Hopkins was a tenant; he was a mere servant; no tenancy was proved; he had no interest in the land, and was not in possession. Heywood v. Fulmer, 158 Ind. 658, 18 L.R.A. 491, 32 N. E. 574; Todhunter v. Armstrong, 6 Cal. Unrep. 27, 53 Pac. 446; Kloke v. Wolff, 78 Neb. 504, 11 L.R.A.(N.S.) 99, 111 N. W. 134; McCutchen v. Crenshaw, 40 S. C. 511, 19 S. E. 140, 24 Cyc. 78.

Where one raises a crop upon land of another under contract for a particular part of the crop, he is a mere "cropper." Where there is a joint occupation, which does not exclude the owner of the land from possession, the contract is a mere "letting." The relation of landlord and tenant does not exist. 24 Cyc. 877, 878, 1464; 12 Cyc. 779; Christian v. Crocker, 25 Ark. 327, 99 Am. Dec. 223; Taylor v. Bradley, 39 N. Y. 129, 100 Am. Dec. 415; 32 Century Dig. title Landlord & Tenant, and all cases cited under § 1399; Ferris v. Hoglan, 121 Ala. 240, 25 So. 834; Adams v. McKesson, 53 Pa. 81, 91 Am. Dec. 183; Pom. Eq. Jur. § 1048.

The property must have been impressed with the trust before the mortgages would attach to the proceeds. Sharp v. Goodwin, 51 Cal. 221; Scott v. Umbarger, 41 Cal. 411; Price v. Reeves, 38 Cal. 457; Newton v. Porter, 69 N. Y. 133, 25 Am. Rep. 153; 2 Story, Eq. Jur. §§ 1258, 1259 and 1260.

The right to follow and reclaim a trust fund is always based upon the right of property, and is never based upon the theory of preference by right of an unlawful conversion. Ferris v. Van Vechten, 73 N. Y. 113; Bromley v. Cleveland, C. C. & St. L. R. Co. 103 Wis. 562, 79 N. W. 741; Dowie v. Humphrey, 91 Wis. 98, 64 N. W. 315; 39 Cyc. 529, 541; Alexander v. Spaulding, 160 Ind. 176, 66 N. E. 694; Twohy Mercantile Co. v. Melbye, 78 Minn. 357, 81 N. W. 20; Third Nat. Bank v. Stillwater Gas Co. 36 Minn. 75, 30 N. W. 440; Seybold v. Grand Forks Bank, 5 N. D. 460, 67 N. W. 682; Farmers' & T. Bank v. Kimball Mill. Co. 1 S. D. 388, 36 Am. St. Rep. 739, 47 N. W. 404.

The cropper's mortgage of ungrown crops passes no title to his interest if he subsequently fails to request a division and delivery of any part of the crop. Savings Bank v. Canfield, 12 S. D. 330, 81 N. W. 630.

A mortgage cannot shift from one piece of property to another. Bidgood v. Monarch Elevator Co. 9 N. D. 627, 81 Am. St. Rep. 604, 84 N. W. 561; Hawk v. Konouzki, 10 N. D. 37, 84 N. W. 563; Omlie v. Farmers' State Bank, 8 N. D. 570, 80 N. W. 689.

Where one party lived with the owner on his farm, and helped in raising the crops, this fact does not overcome the presumption of ownership in the owner. Thurston v. Osborne-McMillan Elevator Co. 13 N. D. 508, 101 N. W. 892; Olson v. O'Connor, 9 N. D. 504, 81 Am. St. Rep. 595, 84 N. W. 359; Meacham v. Herndon, 86 Tenn. 366, 6 S. W. 741; Ferris v. Hoglan, 121 Ala. 240, 25 So. 834.

J. D. Carr and Knauf & Knauf, for respondents.

Where a landowner has rented his farm to another under written lease for a specified term, and the tenant goes into possession and farms the land for the full term, and for other succeeding years without any new lease or further agreement, the landowner thereby elects to treat him as a tenant in accordance with the terms of the contract. Merchants' State Bank v. Ruettell, 12 N. D. 519, 97 N. W. 853.

Under such circumstances the law implies a renewed lease under the same terms. Abraham v. Nicrosi, 87 Ala. 173; 6 So. 293; Quinlan v. Bonte, 25 Ill. App. 240; Bollenbacker v. Fritts, 98 Ind. 50; Foucher v. Leeds, 2 La. 403; DeYoung v. Buchanan, 10 Gill & J. 149, 32 Am. Dec. 156; Johnson v. Doll, 11 Misc. 345, 32 N. Y. Supp. 132; Scott v. Beecher, 91 Mich. 590, 52 N. W. 20; Wolffe v. Wolff, 69 Ala. 549, 44 Am. Rep. 526.

The crops were impressed with the lien of the mortgage. The proceeds of the sale of the crops constituted a trust fund. Such trust may be followed and the property recovered, either in its original or substituted form, when it can be clearly traced or identified in some specific fund or property. Northern Dakota Elevator Co. v. Clark, 3 N. D. 26, 53 N. W. 175, and cited cases; Farmers' & T. Bank v. Kimball Mill. Co. 1 S. D. 388, 47 N. W. 405.

It makes no difference in reason or law, into what other form, different from the original, the property may have gone, if it and the proceeds can be clearly traced. Scott v. Surman, Willes, Rep. 400; Whitecomb v. Jacob, 1 Salk. 161; Rev. Codes 1905, §§ 5707, 5710, 5742.

SPALDING, Ch. J. This action was brought to determine the ownership of the proceeds of a certain crop raised by one G. N. Hopkins upon land belonging to the plaintiff and appellant during the year 1911. The defendants, other than Hopkins, are claimants each to a portion of said proceeds under chattel mortgages, upon Hopkins's share of the crop, duly executed and filed, given by said Hopkins to secure indebtedness owed by him to such defendants respectively. The claim of the plaintiff is that he employed Hopkins to sow and harvest the crop in question, and was to pay him, as compensation for his labor and that of his teams and the use of his machinery, one half the proceeds of the crop so raised, and that the whole of such one half was to be applied upon indebtedness owing from Hopkins to him.

The case is here for trial de novo, and we find the facts to be that the plaintiff was the owner of the land; that for several years preceding the year 1909 defendant Hopkins had been plaintiff's tenant on said land, one half the crop raised each year belonging to Hopkins. No formal lease was executed for the years 1909, 1910, and 1911, but

Hopkins remained on the land, and continued to cultivate it, with no new agreement or contract. In the meantime he gave separate mortgages on his half of the crop of 1911 to each of the defendants, as follows: September 22, 1910, to the defendant Farmers & Merchants Bank, at Kensal, to secure $335.61, payable October 1, 1911; on the 3d of October, 1910, to the Kensal Implement Company to secure his note for $705.73, due October 1, 1911, on which the sum of $149 was paid in November, 1911; on October 12, 1910, to defendant H. M. Tucker Company, to secure his note for $128.05, on which $50 was paid October 12, 1911. Each of said mortgages was properly filed on or about the date it was given. It is found that said McKenzie had sold crops aggregating in value more than the amount involved in this litigation, and appropriated to his own use the proceeds; that about the 7th day of November, 1911, he shipped to the Minnekota Elevator Company a portion of said crop belonging to the defendant Hopkins, for sale; that said elevator company sold the same, and that the net proceeds thereof were $1403.23; that subsequently and while said elevator company still retained possession of the proceeds of such crop so belonging to said Hopkins, it caused to be presented to the district court of Stutsman county, and filed in the office of the clerk thereof, an affidavit stating the amount of money in its hands derived from the crop so sold, that there were conflicting claims thereto, and setting forth the mortgages of the defendant hereinbefore described, and that it was unable to determine to whom said proceeds of said grain rightfully belonged, or who was entitled to the possession thereof; whereupon the court made its order designating the Stutsman County Bank of Courtney as a depositary with which said sum of money might be deposited, and directing notice to be given to all parties holding conflicting claims thereto, pursuant to § 6995, Rev. Codes 1905; that thereupon said Elevator Company deposited said sum with said bank.

Hopkins furnished all the teams and machinery and most of the labor for the production of the crop, incurred indebtedness to other defendants for supplies, with the knowledge of McKenzie, with no prospect of being able to pay if appellant's version is correct, unless the one half of the crop paid more than the debt due him; and when appellant learned that the mortgages in question had been given, and

one half the crop insured as belonging to Hopkins, he said nothing to the mortgagees. There was no crop in 1909 or 1910.

We cannot reproduce the evidence in full, showing the grounds for our conclusion, but call attention to some of its salient features. The appellant's family lived in Jamestown during all the time in question, and he testifies that he was on the farm during the farming season most of the time; that he raised the crop; that nobody else had any interest in it; that he was the owner of the proceeds; that he was on the farm while the crop was being put in and harvested; that there was no written contract for the year 1911, or for the years 1909 and 1910; that he did not rent it for 1909 and 1910 to anybody; that the agreement was that Hopkins was to farm it, and after appellant got the crop he was to give Hopkins credit on a debt he was then owing, for the amount received from one half the crop; that this applied to the three years, 1909, 1910, and 1911, but that in the spring of 1911 he had no agreement with Hopkins as to what share of the crop he was to receive. After thus testifying, he further states that in the spring of 1909 he had a talk with Hopkins, and it was arranged in such talk that he was to work there, and have for his work the money received from half the crop, to be applied on the indebtedness of Hopkins to appellant; that he had the same talk in the spring of 1911 as to the crop for that year; that he supposed that there was nothing said as to what should be done with the surplus, if there was grain enough to pay the indebtedness, but that it was his intention to give the balance of that half to Hopkins, but that appellant was to handle the crop entirely.

These extracts from the testimony of McKenzie we quote:

Q. At that time (spring of 1911) you had no agreement with him as to what share of the crops he was to receive?

A. No, sir.

Q. But I believe you said you expected to give him credit for one half the proceeds thereof upon his indebtedness, if he received any crop?

A. Yes, sir.

Q. That was true during 1909 and 1910?

A. Yes, sir.

And again:

Q. Now, when did you tell Mr. Hopkins for the crop of 1911 that he was not to have any interest in that crop?

A. I do not know that I ever told him that.

Q. You never told him that?

A. I do not know as I did.

Q. You never told him in the spring of 1911 to that effect?

A. No.

Q. Nor in the fall of 1910?

A. I do not remember that I did say anything to him about the 1911 crop in 1910.

Q. And in 1910 you did not tell him that before harvest, did you?

A. I do not remember that I ever did.

The defendant Hopkins testified that it was his horses and machinery that were used to farm the land; that he thought he made an arrangement with McKenzie for farming the land in 1911, about the 1st of April of that year; that he was then living on the farm; that he had no settlement in 1909; that in 1911 he got from McKenzie about $150 for hired help, and McKenzie did not agree to give him any interest in the crop; that he had never had any settlement with him; that McKenzie was the boss; that he himself did not engage threshers to thresh the crop; that he did not expect to get anything for his wages and use of his teams and machinery, if there was no crop. A long examination was had with reference to the amount of Hopkins's indebtedness to McKenzie, but he testified that there had been no settlement, and that he did not know what it was; that there was nothing said about how much feed he was to furnish nor when he was to have a settlement; that he was to have his pay when the grain was threshed, but that he had never said anything about getting his pay, but went to Canada immediately after selling his stock, in the fall, after threshing in 1911, without any settlement; that he did not ask McKenzie about selling the crop.

One Nichols, cashier of the defendant Farmers & Merchants State Bank of Kensal, testified that on or about the 23d of September, 1910, he took a mortgage to the bank from Hopkins; that Hopkins told him

he was to stay on the place in 1911, and that about harvest time in 1911 he had a talk with McKenzie, the appellant, relative to such mortgage on the crop; that he told McKenzie that the bank had a first mortgage, and he would like for him to see that Hopkins paid, and McKenzie informed him that he did not know whether Hopkins was farming the land on shares or working by the month that year; that McKenzie never told him that Hopkins had no interest in the crop.

One Feckler testified that he was a member of the Kensal Implement Company, defendant, the holder of one of the mortgages on the crop; that on the 3d of October, 1910, he had a talk with Hopkins, and was informed by him that he was to continue to work the land on shares, and would give him a one-half mortgage on the crop of 1911; that he thereupon took the mortgage; that in January or February he had a talk with appellant McKenzie regarding the crop grown in 1911, wherein he asked McKenzie if there was no way to settle the matter without going into court and avoid expenses, and McKenzie said that there had been no written lease for the last two years, and that there was no equity for him in the grain and crops; that during a talk in 1910 Hopkins informed him that he was going to work the farm on shares, and that McKenzie told him to work the land as he had been.

J. S. Carr, an attorney, testified, among other things, that during October or November, 1911, he had a conversation with McKenzie regarding the grain involved in this action; that he notified McKenzie of the chattel mortgages held by the Implement Company and the Bank, and inquired of McKenzie if Hopkins was his renter, and that McKenzie's reply was that he did not know whether he was his renter or hired man that year; that he then asked McKenzie if Hopkins had been renting his land the last year, 1910, and that he said yes, that this year it was different but he guessed he had not made any new agreement, that on another occasion he was employed to present a bill to McKenzie for collection, and, among other things McKenzie told was that he guessed he would make Hopkins his hired man for the year 1911. Carr also testified that in the latter part of June or fore part of July, 1912, after Hopkins had returned from Canada to serve as a witness in this case, he had a talk with him, and Hopkins informed him that he worked the land in 1911 as a renter, or at least

that he, Hopkins, understood so; that he understood he was working it in 1911 as he had in 1910; that he said he did not have any agreement.

One Holmes testified that Hopkins came to him in the fall of 1910, and asked him to do the threshing on the McKenzie lands, on which he had a crop in 1911.

One Croonquist testified as to conversations he had with reference to taking hail insurance on Hopkins's share of the crop, and again about a conversation when Hopkins was threshing when he was informed by Hopkins that he had shipped a car of flax, and when he got returns he would pay the money; that he shipped it because Mc-Kenzie wanted to ship it all.

Hopkins testified on cross-examination that in the spring of 1911 McKenzie told him to go ahead and work on the farm with the horses and machinery, and he would furnish the men, pay him one half the crop, to be credited on what he owed McKenzie; that he did not expect to get anything for his work if he raised no crop.

McKenzie denied in some cases having made statements that he did not know whether Hopkins was his renter or hired man, and in others disclaimed any recollection of such statements. The mortgages in question were proved and introduced as exhibits, and it was shown that about harvest time in 1911 McKenzie had gone to the register of deeds' office and made a list of such mortgages; that also on the 12th of June, 1911, Hopkins had applied for hail insurance on his half of the crop, and obtained a policy later. Among the mortgages disclosed on Hopkins's half of the crop for 1910 was one given by Hopkins to McKenzie, securing $1,500, dated October 1st, 1909, and another securing $1,569.35, covering much personal property and an undivided interest in the crops for the year 1905, and bearing date of October 1st, 1905. Affidavits of McKenzie renewing this mortgage are in evidence and bear date of March 5th, 1908, and February 7th, 1911, and the security was sold under foreclosure on the 17th of November, 1911. There was then claimed to be due on the debt secured thereby $1,862.59, and the net proceeds were $1,292.41.

Of course, the testimony showing what Hopkins told different witnesses not in the presence of McKenzie is not competent for all purposes, but it was admissible to show Hopkins's understanding at the

time the mortgages were given, and the conversations to show his understanding that he was a lessee of McKenzie, and not his hired man. There is much testimony, a great deal of which is conflicting or evasive, which, as we have indicated, it is impossible to set forth.

As an illustration of the examination of Hopkins we quote as follows from the record:

The Court: What were you going to get for your wages if you did not get any crop?

The Witness: A. I did not expect to get anything, the same as I had for four or five years. I owed George there, and he told me I would have a chance to pay it off in that way.

The Court: You just depended entirely on raising a crop if you got anything there.

The Witness: Yes, sir.

The Court: Did you owe him for that money he advanced in 1911 to you?

The Witness: I do not know. I have not kept account of anything.

The Court: And you want to tell the court that you did not know anything about what that contract is between you and Mr. McKenzie; we want to know the truth about it?

The Witness: Which contract?

The Court: Do you know you owe him anything for the money advanced for you?

The Witness: What money?

The Court: Do you owe him any of that money?

Mr. Thorp: I want to ask what money the court means?

The Court: The money advanced to pay the hired men. Do you owe him anything paid hired men?

The Witness: No, sir.

The Court: Do you owe him any other money advanced in 1911?

The Witness: No, not that I remember of.

The Court: You don't owe him a thing for 1911?

The Witness: Yes, as much as it is.

The Court: State what it is.

The Witness: I do not know what it is.

The Court: You don't know what it is?

The Witness: No, sir.

The Court: Well, was he to furnish everything there on the place?

The Witness: To furnish the men.

The Court: Did he hire the men?

The Witness: No.

The Court: You hired the men?

The Witness: Yes, told me to hire the men.

The Court: When was this contract, this statement, first entered into between you and Mr. McKenzie?

The Witness: About the first of April. I believe he was over there to buy some feed and seed.

The Court: Was there anything said about how much you were to furnish there?

The Witness: No, sir.

The Court: Was there anything said about how much you were to put in?

The Witness: Yes, sir. I believe there was.

The Court: When you were to have a settlement or not, anything said about that?

The Witness: No, not anything in particular.

The Court: Was there anything said about when you were to get your pay for your work?

The Witness: When the grain was threshed.

The Court: Have you ever asked for it?

The Witness: No, sir.

Mr. Knauf: Q. You went up to Canada immediately after selling your stock, did you not?

A. Yes, sir.

Q. That was along about the 1st of November, 1911?

A. No, I think it was about the 18th or 20th of December.

Q. And before you went you did not have any settlement with Mr. McKenzie?

A. No, sir.

Q. He did not pay you any money, or you give him any?

A. No, sir.

A consideration of the entire record cannot fail to impress the reader

with a conviction that Hopkins remained on the place during the years 1909, 1910, and 1911 without any new contract; and that the theory that he was using all his horses and machinery, boarding himself and family, and incurring considerable other expense besides his own labor, for the purpose of making payment on his indebtedness to McKenzie, and with the probability of leaving him nothing on which to live or keep up his belongings, was thought of after McKenzie discovered the mortgages to the defendants named, in the office of the register of deeds. After the crop was harvested he foreclosed on the personal property; Hopkins went to Canada without any settlement, and, as each of them testify, without knowledge of the amount due or whether it had all been paid by the foreclosure and the share of the crop. No effort was made at settlement. No demand for one was made by Hopkins. Altogether the theory of appellant seems wholly improbable, and the contract, one that no man in poor circumstances, hard pressed, and, as shown, without funds, as Hopkins was, would make. Furthermore, as near as can be computed from the evidence, half the crop brought a considerable sum more than enough to pay the indebtedness due McKenzie, and in this connection it must be said that the $1,500 mortgage on the 1910 crop is shown by the record to have been given with a view to defrauding creditors, and accepted by McKenzie for that purpose. This shows the disposition of the parties. McKenzie was repeatedly questioned about the indebtedness, and, when recalled after other witnesses had testified, was still unable to state the amount, and had evidently made no attempt to ascertain it. While this court is required to find the facts on the record before us, without regard to the findings of the trial court, yet the character of the testimony is such that the trial court had a great advantage over this court in determining the facts, and we feel that any doubt should be resolved in favor of the findings made. Among such findings was the following:

"That said Hopkins was the renter, tenant, and lessee of said lands in 1911, and that he had said lands so rented from said McKenzie, under and by virtue of which rental said McKenzie was to receive an one-half of the grains maturing on said lands in 1911, and the said Hopkins to receive an one-half thereof; that all of the grains raised on said land in 1911 were sold by said McKenzie; that said grains were of the value and sold for the sum of $4,200.29 and therefrom said

McKenzie received the sum of $2,797.06, all of which he appropriated to his own use, and that the balance of the value of said grains and for which said sold was $1,403.23, which said sum was deposited in said Stutsman County Bank of Courtenay, as aforesaid, and that said Hopkins was the owner of all of the grain for which said $1,403.23 was received from the said grain belonging to said Hopkins, and matured in 1911 upon said lands, by reason of his tenancy upon said lands."

A further statement of the conflicting and indefinite statements of both appellant and Hopkins on the subject would serve no useful purpose, and is therefore not made. The circumstances—the fact that appellant surrendered possession during all the years, his apparent disinclination or his inability to disclose the amount of the debt due from Hopkins, and the latter's total lack of knowledge on that subject, as well as many other circumstances—all support our conclusion that Hopkins was cropping the farm under no new contract. Section 5531, Rev. Codes 1905, reads: "If a lessee of real property remains in possession thereof after the expiration of the hiring, and the lessor accepts rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding one year." Having found that the evidence does not justify a finding that there was a new contract providing for the employment of Hopkins by appellant, § 5531, supra, directly applies. There was a lease for prior years, that is, years prior to 1909, and Hopkins remained on the land with no new contract during the years 1909, 1910, and 1911, and appellant received rent for said premises from Hopkins during the year 1911; thereby a renewal of that lease took place from year to year. Wadsworth v. Owens, 21 N. D. 255, 130 N. W. 932. In saying that there was a lease for years prior to 1909, we adopt the designation of the contract for such years made by parties and counsel. The contract is not in evidence.

The only other question is whether the plaintiff mortgagees can recover their interest in the fund, now in the hands of the depositary designated by the court, in this action. The contention of appellant is that, if the crop belonged to Hopkins, a conversion took place, and that the defendants are not entitled to have the ownership of the fund on deposit determined in this action. This question is briefed at con-

siderable length. It, however, appears to us to require but brief notice. Section 6995, Rev. Codes 1905, reads as follows: "Whenever two or more persons make claim for the whole or any part of the same money, personal property, or effects in the possession or control of any other person as bailee or otherwise, and the right of any such claimant is adverse to the right of any other claimant, or is disputed or doubtful, and the bailee, custodian, or person in control of any part of such property, money, or effects is unable to determine to whom the same rightfully belongs, or who is rightfully entitled to the possession thereof; or whenever such bailee, custodian, or person in control has notice or knowledge of any right or claim of right of any person in or to any part of such property, money, or effects adverse to the right of any other claimant therefor; or whenever any debt, money, property, or effects owing by or in the possession or under the control of any person may be attached by garnishment or other process, and there is any dispute as to who is entitled to the same or any part thereof; in any such case the person in the possession or control of any such property, money, or effects, when an action in any form has been commenced for an account of or growing out of the same or in which the same has been attached as aforesaid, may pay such money or deliver such property or effects to the clerk of the court in which any such action having reference to said money, property, or effects, or the value thereof, may be pending, or out of which any garnishment or other process may issue with reference thereto; or if no such suit is commenced he may apply to the district court of the district where such property, money, or effects may be situated, and upon showing to the satisfaction of the court the existence of facts bringing him within the operation of this section, said court shall make an order designating a depositary with whom said property, money, or effects may be deposited by the applicant for such order. In either case such person in the possession or control of such property, money, or effects shall at once notify personally or by registered mail all persons of whose claims he may have notice or knowledge, having or claiming any interest, property, lien, or right in, to or upon such property, money, or effects, of such deposit; and upon giving such notice the person so depositing the same shall thereupon be relieved from further liability to any person on account of such property,

29 N. D.—13.

money, or effects; provided, that such depositor may be required upon the application of any party interested therein to appear and make disclosure before the court in which any such action may be pending, or by which any order designating a depositor may be made, concerning the said property, money, debts, or effects held, controlled, or owed by him. If the address of any persons having or making any claim as aforesaid cannot be ascertained, an affidavit to that effect shall be filed with the depositary, and the giving of such notice shall not be required in such case." The consignee or bailee of the crop in question, before paying the proceeds thereof to appellant, learned of the conflicting claims of the several parties thereto, and made application to the court, under the provisions of the foregoing section, to be permitted to deposit the proceeds thereof in some bank to be designated by the court, and such designation was made by order. Had the elevator company failed to make such application, it would probably have become involved in expensive litigation with all the parties to this action. It might have been liable for conversion or in other forms of action. The statute, it appears to this court, was intended to obviate this risk on the part of the elevator company. The company was willing to pay the proceeds of the crop to such person or persons as were lawfully entitled to the same, and by making the application and the deposit in accordance with the order of the court the fund could be preserved intact and the elevator company relieved of liability to either of the several claimants. Such claimants could then litigate between themselves the question of ownership in the fund, or the effect of their liens thereon. It appears to be a very salutary provision, and intended by the legislature to apply to claims of the nature here exhibited. A case could hardly arise where it would be applicable if it is not so in the case at bar. There is no question of the identity of the fund. The proceeds of the crop were paid to the bank immediately upon sale and the entry of the order by the court. Such proceeds constitute a fund in the hands of the bank, subject to distribution to such claimants as may be entitled thereto, or to any part thereof, as determined in legal proceedings, in the absence of any waiver on the part of one or more claimants. McKenzie, the plaintiff and appellant, brought this suit, selecting his own form of action for determining to whom it should be distributed. In his complaint he

sets out his claim to ownership and the facts relating to the consign-ment, sale, amount received, the application to and order of the court appointing the bank a depositary, the giving of notice by the elevator company to the various claimants, as required by law, and the fact that the defendants named claim some right, title, or interest in and to said fund adverse to the claims of plaintiff. He then denied that the defendants had any right, title, or interest therein, or to the flax from which said fund was derived, and averred that their claims were subordinated to and inferior to his rights. He demanded an order from the court directing said depositary to pay him the entire fund in its hands, and that the claims of the defendants and each of them be adjudged null and void and inferior to the rights of the plaintiff. The defendants answered separately, setting up in detail the liens under which they claimed and the amount due on their respective liens, and that the fund in the hands of the bank was the proceeds of a crop on which their liens existed, and each demanded judgment for the payment by the bank to him of the sum due on his separate lien. It seems to us that all the pleadings in the action, taken together, fully set forth the facts on which the respective parties rely for recovery, and that by whatever name the action is denominated no more appropriate method could be devised for determining the rights of the parties than by the form of action and defense employed. The question is, Who is entitled to the funds in the hands of the depositary? The facts necessary to a determination of this question are set forth in the pleadings. The elevator company presumably was the innocent consignee of the crop. It sought to be relieved from litigation and costs and the liabilities incident to a retention of the proceeds by itself, and those which might arise if payment was made to appellant. In the absence of the statute heretofore quoted, it is impossible that some of the contentions of appellant might be important, but, as indicated, the statute seems to be intended for cases like the one before us, and to furnish a method of relieving an innocent party from expensive litigation, and providing for claimants to the fund or property bearing the burden of ascertaining their own legal rights. We are satisfied that the judgment of the trial court is correct. It is therefore affirmed.

BURKE, J., dissenting. No questions of law are involved in this case, it being merely a trial *de novo* in this court. The statement

of facts is, in my opinion, inaccurate, and for that reason I set forth a new statement, quoting from the record itself, and giving the folios of the abstract on file in this office, so that any person interested can verify the same.

The plaintiff, McKenzie, is a farmer, and part of the land in question was his government homestead. In the fall of 1904 he was elected register of deeds of Stutsman county, and removed his family to the county seat, at Jamestown. At the same time he rented his farm to the defendant Hopkins and his brother, for the years 1905 and 1906. At the same time he sold to Hopkins upon credit the farm machinery in stock which he had theretofore used upon said farm, and to secure such indebtedness took back a mortgage upon said property and also upon Hopkins's share of the crops to be grown during the years 1905–6. In the fall of 1906 McKenzie was re-elected register of deeds, and renewed his lease with Hopkins for the years 1907 and 1908. At the end of that time McKenzie retired to private life.

At folio 71 of the abstract he testifies:

Q. Mr. McKenzie, since you left the farm, did you rent it to somebody?

A. Yes, sir.

Q. That includes the land in 16?

A. Yes, sir.

Q. Who did you rent it to?

A. George Hopkins and Thomas Hopkins for the years 1905 and 1906.

Q. And for the years 1907 and 1908, to whom did you rent your land?

A. To Hopkins.

Q. What Hopkins?

A. George.

Q. George Hopkins?

A. Yes. I don't remember if Thomas was included in that contract or not. You can tell by looking at the contract.

Q. *In 1909 and 1910, to whom did you rent the land?*

A. *I did not rent the land to anybody.*

Q. In the years 1909 or 1910?

A. No, sir.

Q. In 1911, who had it?

A. I had it.

Q. You had it in 1909 and 1910?

A. Yes, why, I had it.

Q. In 1909?

A. Yes, sir.

Q. And 1910?

A. Yes, sir.

And at folio 75:

Q. Who run the place? Mr. Hopkins run the place in 1909 and 1910, did he not?

A. No, sir.

Q. Did he work on shares?

A. No, sir.

Q. Is it not a fact that in 1909 and 1910 he had it in on contract?

A. No, sir.

Q. You got part of the crop and he a part?

A. No, sir.

Q. Is it not a fact that in 1911 that he had it in on shares?

A. No, sir.

Q. In 1909 and 1910 he farmed it, did he not?

A. For me.

Q. Farmed it there with his own horses and machinery?

A. Yes, sir.

Q. And under what kind of an agreement did he farm it?

A. *I was to pay him money,* allow him so much on account of what he owed me on working the land.

And at folio 84:

A. He was to be allowed one half of the proceeds in money of the crop.

Q. After you got the crop?

A. Yes.

Q. And for 1910?

A. It would be the same thing.

Q. For 1911, what was you to allow him?

A. It would be the same thing.

Q. 1911, that was last year?

A. Yes, sir.

Q. And each year, you expected, as I understand it, to charge his half of the crop, or the proceeds of the half of the crop, upon his indebtedness, and credit it upon his indebtedness to you?

A. Yes, sir.

At folio 87:

Q. In 1908, he had a contract in writing for the land?

A. Yes, sir.

Q. That was for one half the crop?

A. Yes, sir.

Q. *That was what we call the half-crop contract plan?*

A. Yes, sir.

Mr. Thorp: That was in 1908?

Witness: A. 1908, yes, sir.

Mr. John Knauf: Q. Have you got that contract?

A. Yes, sir.

Q. Produce it, please. (The witness produces paper and hands to Mr. Knauf.)

And at folio 211 the record reads:

Q. You testified this morning, Mr. McKenzie, that up to and including the year 1908, you had a written contract with Mr. Hopkins?

A. Yes, sir.

Q. When was that concluded, what was the last year you had a written contract?

A. 1908.

Q. Did you have any talk with Hopkins after the expiration of the 1908 contract with reference to his conducting the farm for the year 1909?

A. In the spring of 1909, I had a talk with him.

Q. That was about the work he was to do on this farm?

A. Yes, sir.

Q. What was that arrangement, what was said?

A. He was to work there and to have for his work, I was to allow him, the money received from half of the crop.

Q. And what was you to do with those proceeds?

A. I was to apply it on his account, what he owed me.

Q. Did you make any arrangement whereby he was to have any interest in the crop at all?

A. None.

Q. Who paid the hired help, did you furnish the money for to pay the hired help?

A. I did.

Q. Now, in the spring of 1911, did you have any talk about farming operations that year?

A. That same as we had in 1909.

Q. You hired the men to work for you that year?

A. Yes.

Q. His compensation was to be regulated from the proceeds of the crop?

A. Yes, the crop raised.

Q. Did you pay the hired help the season of 1911?

A. I did, advanced the money to pay the thresh bill.

Q. Did you boss the crop yourself?

A. Yes, sir.

Q. Did you work the land yourself?

A. Yes, sir.

Q. Boss the job yourself?

A. Yes, sir.

Q. Now, have you ever got enough proceeds out of the 1911 crop to pay for what Mr. Hopkins owed you?

A. No, I don't think there is—I never figured it up closely.

At folio 225:

Q. When was it that you made the arrangement with him that he was to farm your land for 1911, and you were to take one half of the crop, and give him half of the crops or proceeds from a half of the crop?

A. In the spring of 1911.

The defendant Hopkins, the tenant, was also a witness, and testifies as follows, at folio 232:

Q. You are the identical person who farmed on this land on sections 9 and 16 in controversy in this action, in 1911, are you?

A. I was living there.

Q. You farmed that land?

A. For Mr. McKenzie.

Q. Your horses and machinery, whose horses and machinery were used in farming that land?

A. Mine.

Q. Did you have any written agreement for farming or not in 1911?

A. No, sir.

Q. Did you have any oral agreement for farming in 1911?

A. Yes, sir.

Q. And when did you make that agreement?

A. I think it was about the 1st of April, I believe, 1911.

At folio 280:

Q. You say you had a verbal agreement for 1911?

A. Yes, sir.

Q. The spring of 1911?

A. Yes, sir.

Q. What was it?

A. Why, Mr. McKenzie told me to go ahead and work on the farm with the horses and machinery, and he would furnish the men and pay me half of the crop I got, to be paid on what I owed him.

Q. You mean to say he would pay you half the money from the crop, net?

A. Would give me credit for it on what I owed him.

Q. Did he agree to give you any interest in the crop?

A. No, sir.

Q. You owed him at that time, did you?

A. I did.

Q. Did he agree to give you the crop or the money?

A. He did not say.

Q. Have you ever had any complete settlement with him?

A. No, sir.

At folio 284:

Q. Who was to run the farm—who was the boss?

A. He was the boss.

Q. Did you do all he told you to do?

A. Yes, sir.

Q. Did what, when, and where he told you to do?

A. Yes, sir.

Q. Worked your teams when and where he told you to?

A. Yes, sir.

Q. The value of your services were to be regulated by the value of the crops?

A. Yes, sir.

Q. That was all there was to it?

A. Yes, sir.

Q. Did Mr. McKenzie work there in 1911?

A. He did.

Q. Did he pay the thresh bill?

A. I suppose so, I did not have anything to do with it.

Q. Did he hire the thresher.

A. Yes, sir.

Q. And boss the threshing?

A. Yes, sir.

Q. Told you where to haul the grain and what to do with it?

A. Yes, sir.

At folio 296:

Q. Well, was he to furnish everything there on the place?

A. To furnish the men.

Q. Did he hire the men?

A. No.

Q. You hired the men?

A. Yes, told me to hire the men.

Q. When was this contract, this statement, first entered into between you and Mr. McKenzie?

A. About the 1st of April, I believe, he was over there to buy some feed and seed.

In the face of the evidence above set forth, is it not fair to ask what value is the finding of the majority of this court in the second paragraph of the opinion which reads as follows: "No formal lease was executed for the years 1909, 1910, and 1911, but Hopkins remained on the land and continued to cultivate it *with no new agreement or contract.*" Remember, in this connection, that those are the only two men who knew anything about this contract, and that they are not

contradicted by any other witness or record, and only incidentally by some of the circumstances, which, however, upon a careful reading corroborate rather than contradict them.

It seems that Hopkins was unable to pay for the farm machinery and stock which he had bought during the four years that he had this farm lease, on account of the crops being struck by hail, and his indebtedness to McKenzie was increasing yearly.

At folio 102 McKenzie testifies:

Q. In 1908, Mr. Hopkins was indebted to you in a considerable sum of money?

A. Yes, sir.

Q. Do you know how much?

A. I do not know how much, have not figured it up.

Q. In 1910, was he still indebted to you on the same indebtedness?

A. Yes, sir.

Q. With some interest added?

A. Yes, sir.

Q. In 1911, was he indebted on the same indebtedness, with some interest?

A. Yes, sir.

And at folio 107:

Q. And at that time, of that sale, how much was Mr. Hopkins owing you?

A. On the mortgage?

Q. Altogether?

A. I do not know just exactly.

Q. Give it approximately.

A. *Being all matters, twenty-five hundred to three thousand dollars, or such a matter.*

Q. Do you remember what the, what his machinery, farm outfit, and equipment sold for at that mortgage sale?

A. I don't remember. I think I have a paper here showing the exact amount. (Witness produces paper.) The total amount that it sold for was $1,434.75.

Q. Was that the amount which you received?

A. No.

Q. What did you receive from the sale?

A. Well, there was the expenses and expense bill out of that. I think $1,292.41, that was after the expense bill was taken out.

At folio 189 Mr. McKenzie testified:

Q. If you would have given Hopkins one half of the receipts of this crop in question, for his work out there in 1911, for the use of his teams and machinery, would your indebtedness against him have been paid?

A. No, I don't think it would have been.

Q. If you had given him credit for all of the proceeds of one half of your crop, would he still be owing you?

A. Yes, he would.

And at folio 433:

Q. George (McKenzie) won't you please state to the court the amount now that was owing to you from Mr. Hopkins, in the fall of 1911?

A. I could not exactly without figuring it up.

Q. How?

A. I could not exactly without figuring it up. I have never made out a statement or had any settlement whatever since this flax has been held up.

At folio 453:

Mr. Knauf: If the court please, would like to have those items, as we need them.

Mr. McKenzie: If I had the items I would furnish them. The first two years he rented the land for cash rent, and the second year he *could not pay his cash rent,* that was $1 per acre. He paid a little of it, I do not know how much now. There was some of it on that. And from that time on during the next two years, the time he had the two years' contract for half crop, I furnished the feed and seed. I furnished feed and furnished seed for the period of the first two years. I furnished seed the second year, left seed on the place.

The majority opinion mentions, as an incident unfavorable to McKenzie, that he did not produce the exact figures after being recalled, but it is only fair to add that the trial was being held at Jamestown, some 30 miles from McKenzie's home, where he states that he had the

slips going to show the different items due him from Hopkins, and it was not possible for him to produce them on a few hours' notice.

At folio 441, McKenzie testifies:

A. Well, at the time I let him have the farm, I left 1,320 bushels of barley in the granary and elevator on the land, also left 1,400 or 1,500 bushels of oats there, and besides there must have been 25 bushels of potatoes left in the cellar.

Q. And he owed you some for those?

A. Yes, and also a binder was not sold at the sale that I sold to a Mr. Meagers up there, and he kept the money and did not turn in a cent of the money.

Q. And how much was that stuff worth at that time?

A. I do not know at that time. I did not figure selling it. I figured on holding it along until I felt like selling. I did not need the money.

Q. What other debts did he owe you for?

A. Other moneys advanced him during the four years. Did not have any crop, and advanced money to get the crop in.

Q. How much?

A. I could not tell you how much. I never made an itemized statement of it.

Q. Can you do so for it?

A. *I do not know as I have got the account. I have little notes and slips that I have at home.*

In this connection it is worthy of notice that the defendant Hopkins, although a witness in the case, *made no claim that he had paid Mc-Kenzie,* or that the crop for 1911 would pay the indebtedness in full. Of what value, then, may I ask, is the finding of the majority that "half of the crop brought a considerable sum more than to pay the indebtedness due McKenzie?"

Keeping in mind all the foregoing facts, we come to the circumstances outlined in the majority opinion, which tend to support the same, with the idea of reconciling the same with other parts of the record. The quotations given in the majority opinion from the testimony of McKenzie were upon cross-examination and largely play about the proposition of whether or not McKenzie had promised Hopkins an

interest in the *crop,* rather than in the *proceeds.* For example, in the majority opinion, is the following:

"Q. At that time (spring of 1911) you had no agreement with him as to what *share of the crop* he was to receive? A. No sir." McKenzie had all the time claimed that Hopkins had no share in the *crop,* but was to be paid wages *to the amount of one half of the proceeds of* the crop, and it was upon this point that he was being examined, yet the majority opinion sets out this catchy question and answer, rather than the testimony of the witness McKenzie which I have given in this dissenting opinion, which shows positively that there was an agreement in 1911, but not such an agreement as would give Hopkins *an interest in the crop.* Again, the majority opinion mentions the fact that McKenzie took a mortgage upon Hopkins's interest in the crop for 1911. Unexplained, this seems a strong corroboration of their finding, but when we remember that in 1905 and 1906 Hopkins had leased the land for a cash rental, and had bought the farm machinery and stock, and given his mortgage therefor, and that said mortgage had been several times renewed, and that the mortgage to which the majority opinion points was merely a renewal of this old mortgage, the inference that Hopkins had an interest in the crop is much weakened.

At folio 437 McKenzie testifies that these chattel mortgages were merely renewals. I quote:

A. Why, it is a chattel mortgage given for horses, and machinery and harnesses at the time of the sale, in March 15th, 1905.

Q. Who—signed by whom?

A. George N. Hopkins and T. A. Hopkins, his brother.

Q. To whom?

A. George B. McKenzie.

Q. Yourself?

A. Yes, sir.

Q. And exhibits 2A, 2B, 2C, and 2D, constitute renewals of that same chattel mortgage shown in exhibit 2, and made by you?

A. Yes, sir.

Another circumstance pointed out in the majority opinion is that McKenzie failed to notify the machine companies that Hopkins had no

right to mortgage the crop. I have examined the testimony of all of the witnesses, with care, and in my opinion there is absolutely not a contradiction between McKenzie and any of the other witnesses sworn.

For example, McKenzie was asked as to his conversation with Nichols, cashier of the bank. Folio 153:

Q. That talk occurred between you and Nichols at Kensal, North Dakota?

A. Yes, sir.

Q. At that time, is it not a fact, you stated to Nichols in sum and substance as follows: I do not know how Hopkins and I are farming this land in 1911, whether he is a renter or hired man or not; did not you state in sum and substance such language to Nichols?

A. I don't think I stated that exactly.

Q. Will you swear that you did not?

A. It is barely possible I did not (?) make any such statements.

And at folio 176:

Q. When Nichols told you that he had a mortgage upon that crop, you did not tell him at that time that Hopkins did not have any interest in the crop, did you?

A. I might have told him, I don't remember it.

Q. You did not tell Feckler of the Kensal Implement Company, or anyone for them, that Hopkins did not have any interest in that crop, did you?

A. I don't remember, John, whether I did or not.

Q. You did not tell Tucker Company that Hopkins had no interest in it, did you?

A. I never talked with the Tucker Company.

Q. You did not inform any of these people holding mortgages from Hopkins that he did not have any interest in the crop, did you?

A. I don't remember that I did.

Q. Your best recollection is that you never told any one of them?

A. No.

Nichols testifies at folio 319:

A. I had a conversation with McKenzie.

Q. You may state what he said to you about it.

A. Nothing more than I notified him in regard to our mortgage on the crop. I told him about our having a first mortgage, and said I would like for him to see that he paid, and he said that he did not know if Hopkins was farming that on the shares or working by the month this year.

This is not a contradiction of McKenzie. At most, it can only be said that McKenzie had forgotten such conversations if he had them, but was too conscientious to deny having made them. And the conversations themselves, even if had, were in no manner inconsistent with his present contention. Being a farmer and not a lawyer, it was only natural that he should have some doubt as to the exact relationship with Hopkins. The record shows that the first time that McKenzie had any knowledge that Hopkins was given chattel mortgages upon his crop was during the harvest of 1911, and that upon the first intimation he went to the office of the register of deeds, and looked up such mortgage, and made a pencil memorandum thereof, and shortly thereafter foreclosed the mortgage upon Hopkins's horses and machinery, and finished his business relations with him.

As to the presumption that Hopkins was a tenant because he gave the mortgages upon McKenzie's crop, it is well to examine the evidence to see whether or not Hopkins had any such intention. Take, for instance, the testimony of Nichols, cashier of the bank, at folio 316:

Q. You may state to the court what, if any, conversation you had with Hopkins at that time regarding the property contained in the mortgage, and state to the court generally what was said at that time?

A. I called Hopkins into the bank about the 22d day of September, and asked him if there was any chance for him to pay anything he owed us that fall, and he said there was not, and I asked him if he was to stay on the place another year, on the land there, and he said he was, and I drew up the mortgage and renewed the note.

Q. And he signed them at that time?

A. He did, yes, sir.

Regarding the same matter, Hopkins testifies as follows, at folio 270:

A. The Farmers & Merchants State Bank.

Q. And if it was signed on or about the date it bears?

A. Yes, I expect so, I don't remember.

Q. And that exhibit which I just showed you covers the same lands which you farmed of George McKenzie's in 1911, does it not?

A. The land I worked for him.

Q. And you had these same lands in crop in 1911?

A. I helped farm it.

Chattel mortgages obtained in this way do not appeal to me as going very far to show that Hopkins believed he had an interest in the crop, or even knew that he was giving a mortgage to the bank. The same may also be said of the application for hail insurance, but I have not time to set forth this testimony. Just one other thing occurs to me, and that is this: Hopkins had the land upon a cash basis in 1905 and 1906. In 1907 and 1908 there was a written contract on the half-contract plan. This contract was placed into the hands of the attorney for the defendants, and is therefore presumed to have been unfavorable to them, or it would have been offered in evidence. This contract has a significance all its own in the courts of this state as a cropper's contract, and carries with it an implication that there is a reservation of title of the crop in the landowner until all indebtedness due him from the tenant had been paid. If the majority of this court insists upon continuing this contract for the years 1909, 1910, and 1911, they must also continue this clause, and thereunder McKenzie would have a right to hold all the crop until he had been paid the amount due him from the so-called tenant Hopkins. The testimony is undisputed that the entire crop would not pay this indebtedness. Another factor or two, which corroborate my conclusion, might be mentioned. One is that McKenzie, being an able farmer and good manager himself would not be liable to rent a farm during the years 1909, 1910, and 1911. While he was register of deeds, of course, he needed a tenant. Thereafter he would certainly wish to run the farm himself. And lastly, while nominally Hopkins owned the farm machinery and stock, they were really owned by McKenzie. He had sold them to defendant Hopkins on time, and the indebtedness had been allowed to increase year by year. For the foregoing reasons, I respectfully dissent.